Merrimack
No. 82-093

THE STATE OF NEW HAMPSHIRE

v.

JOHN D. LEVESQUE

January 24, 1983

*Gregory H. Smith,* attorney general (*Brian T. Tucker,* assistant attorney general, on the brief and orally), for the State.

*Diversified Legal Services P.A.*, of Concord (*Mark M. Rufo* on the brief and orally), for the defendant.

DOUGLAS, J.  This case involving a warrantless inventory search comes before us on an interlocutory transfer without ruling from Superior Court (*DiClerico*, J.). The defendant was indicted for possession of more than one pound of marijuana, RSA 318-B:26, I(c) (Supp. 1981), and for possession of LSD, RSA 318-B:26, I(a)(2) (Supp. 1981). The marijuana and LSD were found as a result of a search warrant based upon information obtained from the warrantless inventory search.

The issues are: (1) whether the warrantless search of an unlocked part of a briefcase in the defendant's possession when he was taken into custody violated the defendant's rights under the fourth amendment to the United States Constitution and part one, article nineteen of the New Hampshire Constitution; and (2) whether the warrant that was issued for the search of the locked portion of that container could still be considered valid on the basis that the untainted information contained in the affidavit established probable cause for the warrant to issue.

We hold that the inventory search of the unlocked portion of the briefcase was proper and that the warrant to search the locked portion of the briefcase was valid.

The defendant, John D. Levesque, was stopped by a Concord police officer for speeding. Upon inquiry, the defendant identified himself as Wayne Demers, and he informed the police officer that the car he was driving did not belong to him and that he did not have his driver's license with him. The officer advised the defendant that he had been stopped because he was speeding and requested that the defendant remain in the vehicle.

The police officer returned to his cruiser and undertook a license and registration check. While in the process of making these checks, the officer noticed that the defendant was outside the car and that the hood of the vehicle was up. The officer left his cruiser to order the defendant to get back inside the car. As he was approaching the car, the police officer observed the defendant take a vinyl briefcase from the other occupants of the vehicle, tuck the briefcase under his arm, and run towards a nearby line of trees.

At this point, the officer radioed headquarters and then proceeded to give chase on foot. As the officer pursued the defendant, the defendant stumbled and fell. The briefcase either fell or was thrown out of the defendant's hand. The police officer caught up with the defendant, drew his revolver, and ordered the defendant to step aside from the briefcase. The defendant was taken into custody for

54

resisting arrest and then driven to the police station where he was given his *Miranda* warnings, and he elected to remain silent.

During the booking process, the Concord police learned that the defendant's name was John Levesque, not Wayne Demers, that he was wanted in Florida for a probation violation, and that he was under indictment in Hillsborough County for certain drug-related offenses. As part of the booking process and in accordance with standard departmental policy, an inventory was undertaken of everything that the defendant was carrying on his person, and an inventory search was conducted of the closed but unlocked side pocket of the briefcase. The locked portion of the briefcase was not searched at this time.

The inventory search of the unlocked side pocket revealed eighteen packages of cigarette rolling papers, four empty plastic bags, a one-half inch brown vial, a pocket-size index, matches, and three pieces of paper with names, phone numbers, and dollar amounts written on them. Based on these contents of the closed but unlocked portion of the briefcase, the defendant's suspicious activities immediately prior to his arrest, and the fact that the defendant was known to authorities to be heavily involved in drug activities, the Concord police applied for a warrant to search the locked portion of the briefcase. The search warrant was issued, and the locked portion of the briefcase revealed more than one pound of marijuana and a quantity of LSD, the possession of which forms the basis of the charges against the defendant.

To understand the role and purpose of an inventory search, we must first look beyond appellate cases and examine the post-arrest procedures utilized at a police station. The "textbook solution" in proper jail management is that "[e]very prisoner who enters the jail is potentially dangerous, to the personnel as well as other prisoners. Therefore, the first step in the intake procedure should be a careful search of the prisoner and his or her personal effects." INTERNATIONAL CITY MANAGEMENT ASSOCIATION, MUNICIPAL MANAGEMENT SERIES, LOCAL GOVERNMENT POLICE MANAGEMENT 483 (1977). As part of the booking process, the inventory of property is described as follows:

"All personal property should be taken from the prisoner. Each item should be carefully listed on a proper receipt form. This should include a sufficiently detailed description to identify each item. Money should never be permitted to remain with the prisoner, as this may lead to gambling, robbery, and related incidents among the jail population. All personal items should be placed in a sealed bag or

envelope, signed by the prisoner and the booking officer
or property room clerk, with a copy of the receipt given to
the prisoner."

*Id.* Likewise, a widely used book on the law of arrest notes:

"[I]t is the duty of the officer to take possession of the
prisoner's money, articles of value, and other personal
property for safekeeping, so that it may be protected and
restored to him upon his release, as where he is intoxi-
cated or about to be confined among prisoners who might
steal it from him. Withholding such articles from a pris-
oner in jail also has a definite relationship to keeping him
safely in custody and preventing his escape. It is standard
police practice, done to protect the interests of the
arrested person as well as of the police, who otherwise
might be subject to false charges of misappropriation."

E. FISHER, LAWS OF ARREST § 155, at 341 (1967).

In this State, the police are also the "jailers" at any local police
station jail and thus serve a dual role. They must determine who an
arrestee is to call for bail if he is incapacitated or sick. They must
also be sure suicide cannot occur through use of a belt, razors hidden
in a wallet, boot strings, or other items. Thus, for a routine "custody"
search, it is

"routine police procedure for the jailer, or other officer
into whose custody an arrested person is delivered, to
make a thorough search of the person during the booking
process. This is done to protect the interests of the pris-
oner, so that his property may be conserved and protected
during his incarceration. It is also in the best interests of
the police to discover if he carries any weapons which
might aid his escape. Also, the booking process properly
includes taking inventory of the prisoner's personal prop-
erty and conserving and protecting it until his release."

E. FISHER, SEARCH AND SEIZURE § 41, at 71 (1970).

While some courts distinguish the on-scene search at the time
and place of a defendant's arrest from the jailer's search, *State v.
Stevens*, 26 Wis. 2d 451, 459–60, 132 N.W.2d 502, 507 (1965), other
courts construe the latter as an extension of the former:

"The arresting officer was not obliged to complete a
search at the instant of the arrest. A search of a person
about to be left alone in a cell would, in all likelihood, be
more thorough than at the scene of his arrest. We do not

believe that the Fourth Amendment prohibits the proce-
dure of removing the contents of the pockets of a prisoner
who is about to be locked up, even though it is done at a
police station and not at the scene of the arrest. Such a
search is pursuant to an arrest, even though some time
has elapsed between the apprehension of the prisoner and
his incarceration."

*Commonwealth v. Bowlen*, 351 Mass. 655, 657, 223 N.E.2d 391, 394, *cert. denied sub nom. Gilday v. Massachusetts*, 389 U.S. 916 (1967). It is clear that a lawful arrest such as we have in this case justifies reasonable latitude of both the search and the seizure of things found on or in the possession of the defendant. *See United States v. Edwards*, 415 U.S. 800, 805 (1974).

In *South Dakota v. Opperman*, 428 U.S. 364 (1976), the United States Supreme Court found that evidence obtained as a result of routine inventory searches was admissible. *Id.* at 376. Such searches are reasonable because they further three distinct and legitimate needs once the police are legally in possession of the defendant's property: the protection of the owner's property while it remains in police custody, the protection of police against unwarranted claims of lost or stolen property, and the protection of the police from potential danger. *Id.* at 369. It is clear, therefore, that inventory searches are reasonable not only for the defendant's protection but also for the protection of society and the police. *Mooney v. State*, 243 Ga. 373, 380, 254 S.E.2d 337, 344, *cert. denied*, 444 U.S. 886 (1979).

The defendant argues that *Opperman* has been narrowed in scope by *United States v. Chadwick*, 433 U.S. 1 (1977), and by *Arkansas v. Sanders*, 442 U.S. 753 (1979), because those cases relied upon a defendant's expectation of privacy in personal luggage in reaching their holdings that the warrantless searches were unconstitutional. In *Chadwick*, a footlocker suspected by the police of containing narcotics was lifted out of an open car trunk, and the defendants were placed under arrest. The defendants' footlocker was taken into custody and opened without a search warrant, which the Court found violated the fourth amendment. Chadwick, 433 U.S. at 11.

In *Sanders*, a search of a suitcase suspected by the police of containing marijuana and seized from the trunk of a taxi was held to have violated the fourth amendment. Sanders, 442 U.S. at 765–66. *Chadwick* and *Sanders*, however, are distinguishable from the instant case. Neither of those cases involved inventory searches, but both stemmed from arrests based on the contents or the suspected

contents of the luggage as disclosed by the warrantless searches that were not justified by any exception to the warrant requirement.

In the case at bar, the defendant was arrested for the underlying charge of speeding and taken into custody for resisting arrest on that charge, not because of the contents of the briefcase that were disclosed by the inventory search. Under these circumstances, the police were making a routine inventory of the items the defendant had with him during the booking process prior to being incarcerated.

■ The police, in the role of "jailer," had a standard operating policy as caretakers, and not as crime investigators, that made this warrantless search and seizure "reasonable." This court recently held that an inventory search of a film canister found on the person of a lawfully arrested individual was reasonable. In *State v. Maxfield*, 121 N.H. 103, 427 A.2d 12 (1981), we concluded that the governmental interest in protecting the confinement area and the individual to be confined, and the integrity of the police in the administrative handling of the defendant's personal belongings while he is incarcerated, outweighed the individual's right to privacy in his possessions. *Id.* at 106, 427 A.2d at 14. Accordingly, we hold that the inventory search of the closed but unlocked portion of the briefcase was reasonable because the governmental interest underlying such an intrusion outweighed the defendant's right to privacy in his possessions.

Although many courts have held that unopened containers such as luggage cannot be subject to a warrantless inventory search, *see, e.g., United States v. Monclavo-Cruz*, 662 F.2d 1285, 1289 (9th Cir. 1981); *United States v. Presler*, 610 F.2d 1206, 1212–14 (4th Cir. 1979); *United States v. Dien*, 609 F.2d 1038, 1044–45 (2d Cir. 1979), *aff'd*, 615 F.2d 10, 11 (2d Cir. 1980), we are persuaded by courts, such as the Virginia Supreme Court, that have held to the contrary:

> "We are not convinced . . . that law enforcement officers can protect an owner's property and themselves from claims over lost or stolen property by simply sealing and removing personal luggage as a whole. Without a record of the contents of such luggage, police are bereft of any means to verify what property was actually present at the time of its taking. . . . [I]f the basis behind the inventory search is to protect any valuables which might be present, it is illogical to prohibit law enforcement officials from searching those areas wherein valuables are more likely to be kept."

*Hamby v. Commonwealth*, 222 Va. 257, 261, 279 S.E.2d 163, 166 (1981); *see United States v. McCambridge*, 551 F.2d 865, 870–71 (1st

Cir. 1977); *United States v. Davis*, 496 F.2d 1026, 1031–32 (5th Cir. 1974); *State v. Crabtree*, 618 P.2d 484, 486 (Utah 1980).

■■ Because the inventory search of the unlocked portion of the defendant's briefcase was valid, the affidavit in this case contained only untainted information and clearly established probable cause to support the warrant that was issued to search the locked portion of the defendant's briefcase. In any event, we note that no warrant would have been required in this case for the police to conduct an inventory search, incident to the defendant's lawful arrest, of even the locked portion of his briefcase. *State v. Maxfield*, 121 N.H. at 106, 427 A.2d at 14; *see United States v. Brown*, 671 F.2d 585, 587 (D.C. Cir. 1982); *Savoie v. State*, 422 So. 2d 308 (Fla. 1982).

*Remanded.*

All concurred.